## Bourne v. Commonwealth.

(Decided June 17, 1930.)

SANDERS E. CLAY and C. C. BAGBY for appellant.

J. W. CAMMACK, Attorney General, and GEORGE HUNT MITCHELL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY COMMISSIONER STANLEY—Affirming.

This appeal is by Sam Bourne from a conviction of manslaughter and sentence of fifteen years in prison for the killing of Hugh Wayne. The major ground relied on for a reversal of the judgment is that the verdict is flagrantly against the evidence. This requires a statement of the evidence more or less full. Yet a clear understanding of the facts can hardly be had from the record because of their presentation through demonstrations and illustrations rather than descriptive words.

The homicide occurred shortly after 6 o'clock in the evening of February 16, 1929, in Sullivan's pool room in Danville. The parties were neighbors, and there had been no previous difficulty between them. Along the right wall of the room, as one entered the front door, were two or three shoe-shining chairs; then a three or four foot alcove or recess in the wall in which there were four chairs. Then came counters. Pool tables were along the center of the room. The deceased had been sitting in the fourth chair in a corner of the alcove.

Testifying for the commonwealth, George Mills stated he saw Bourne "standing with his hands kinda on the arms of the (deceased's) chair (indicating) leaning or standing over him." He was standing just a few feet away, talking with another man. Nothing attracted his attention to Bourne and Wayne until he heard four or five shots in quick succession, and when he immediately turned Bourne had his back to the witness and he could only see Wayne's head. His vision was obstructed by the cigar counter.

Pete Worthington testified he was sitting in one of the shoe-shining chairs. He heard no talk between the parties. At the sound of the shot he turned and saw Bourne standing in front of Wayne, who seemed to have hold of Bourne with his left hand. Said he: "Wayne seemed to be coming in that way (indicating) and he was pushing him back as he come in," and was shooting him. He could not see what Wayne was doing with his right

hand. The witness demonstrated with one of the lawyers how the parties were situated and acting.

An examining physician, the undertaker, and the coroner testified as to the location of the wounds, but they do not quite agree. Each admitted that his memory was not clear. Moreover, some of these witnesses demonstrated and indicated the place of the wounds, which makes the record almost unintelligible. However, it would appear that the deceased had two or three entrance wounds in the abdomen, one in the front of the right shoulder, and another in the back of the left shoulder, which ranged a little downward and came out in front on the right side. All bullets ranged downward.

Several officers who were nearby rushed in, and they testified the deceased had no weapon upon or about his body.

The defendant testified that he had been sitting in one of the four chairs in the alcove when Wayne entered and sat down beside him and asked him for a match. They engaged in a brief conversation about their jobs before Bourne arose to go with a friend. He had gone about five steps when Wayne called him back. He stepped back and put his hand on Wayne's chair, and the latter asked if he had rented his place. Upon being told that he had, Wayne wanted to know what he was going to do "about that fence down there." Bourne says he told him that he had told his new tenant he would fence it; whereupon Wayne with an oath declared he had nothing to do with it. According to the defendant's version he did not enter into a dispute with Wayne, but undertook to pacify him regarding the fence. Nevertheless Wayne continued his cursing about the fence and also undertook to raise a row about a certain roadway which Bourne had been traveling. He cursed the defendant violently. Upon being called by Charley Dunn to come on, he started to leave, when Wayne jumped up and grabbed him with his left hand, and "says, 'You G—— d— son of a b————, you are taking back water, ain't you?'—reached for his hip pocket with his right hand; I happen to be left handed; I had my gun right here (indicating) and I pulled it out and shot three times as fast as I could shoot; went right in this way (indicating) in here (indicating) at the same time I was trying to get away from him; I twisted around to his left side; was one through his shoulder here (indicating) and one through here (indicating) and he fell over."

The defendant further testified the deceased was drinking and he did not desire trouble with him; that they had never had previous difficulty; but he knew that his reputation as to peace or violence was bad; and that he habitually carried a pistol. He had seen him with one many times, and knew he had previously shot a man "with his hands up."

Five witnesses, including a nephew of the deceased, corroborate more or less fully the testimony of the accused. The credibility of none of them is attacked, except it was testified that the nephew on the night of the homicide had said Bourne had shot his uncle while he was sitting down. It was also established that Wayne had been drinking a half hour and immediately before he was killed; and that he bore a bad reputation. The defendant established a good reputation for peace and order.

It will thus be seen that the preponderance of the evidence was to the effect that the accused shot in self-defense. Nevertheless, there is in our system of jurisprudence no more fundamental principle than that the guilt or innocence of one accused of crime is to be determined by a jury under the instructions of the presiding judge respecting the law applicable to the state of facts heard by the jury. The appellate court is without authority to nullify the verdict of a jury, except where it appears that an error of law has been committed which may have been prejudicial to the substantial legal rights of the defendant. Now and then there comes to this court a record which discloses that a conviction is so shockingly against all the evidence that it would seem of necessity there was some intangible factor or undisclosed element controlling the jury in its decision, such as passion and prejudice, and the court is warranted in reversing the judgment rendered on that verdict. But it has been time and again declared that, where there is any evidence introduced upon which the jury may have based its conclusion of guilt, the verdict will not be disturbed in the absence of a prejudicial error of law. The credibility of the witnesses and the weight to be given their testimony are for the jury to consider and act upon. In this case there is little or no contradiction in the evidence so far as the record before us discloses. It is rather the quantum of proof to be considered; and it is vigorously maintained by counsel for appellant that it

846

is insufficient to sustain the verdict under the rules just adverted to.

The fact that the accused killed the man, that there was evidence that he was not armed, and of a wound in the back, with all the shots ranging downward, coupled with the rather controlling fact that the record before the court is incomplete by reason of the many demonstrations and illustrations not reflected in it, constrains the court to decide that it should not interfere with the verdict on the ground that it is palpably against the evidence.

The court gave in one instruction the law relative to murder and manslaughter, and it is criticized in several particulars. While it has been said that it is better to give separate instructions on these degrees of homicide, the giving of a combined instruction is not improper. Roberson's Criminal Law, sec. 524. At most the criticisms raised are technical. Because of the rather persuasive evidence that the accused shot in his necessary self-defense, we have given meticulous care in our examination of the instructions, but conclude there was no error in them.

The judgment is affirmed.