## Mullins v. Commonwealth.

(Decided June 15, 1937.)

A. F. BOYD and ERVINE TURNER for appellant.

HUBERT MEREDITH, Attorney General, for appellee.

OPINION OF THE COURT BY CREAL, COMMISSIONER—Affirming.

Indicted for the murder of Arnold King, Frank Mullins has been convicted of voluntary manslaughter and sentenced to imprisonment for five years. He is appealing, and as grounds for reversal argues (1) that the verdict of the jury is contrary to law and not supported by evidence and resulted from passion and prejudice on the part of the jury; that the circuit court erred in not giving a peremptory instruction to find him not guilty; and (2) that the court admitted incompetent and prejudicial evidence over his objections.

The homicide occurred at the home of Sherman King, brother of deceased, on Sunday, August 5, 1934. Deceased had married Maggie Mullins, sister of appellant, about a year prior to the homicide and the marital relation continued, however, Mrs. Arnold King made her home with her father, but spent some of her time at the home of deceased's brother Sherman King. It seems that deceased spent some of his time with his brother, Sherman King, but his permanent place of abode appears to have been at the home of Fred Elam. Appellant was unmarried and lived with his father. On the

morning of the homicide, the mother of appellant and his two sisters, Jessie and Bessie Mullins, left their home to attend Sunday school at Miller's school house, about a mile away where they met with Etta King and Maggie Arnold. After leaving the school house, they all started to Mudd Lick church about three miles away and came upon appellant at Smith William's store and they were later joined by Oscar Salley, Robert Salley, Hoy Salley, and Arnold King. After the crowd started to the church, deceased and Hoy Salley went on ahead of the others and, according to the evidence of a number of witnesses, the crowd again met with deceased and Hoy Salley and the former had a pint bottle of whisky and also a pistol in a holster under his shirt. Appellant testified that he left his home intending to go to the home of one of the Salley's, but met up with the crowd at Williams store near Miller's school house. He was carrying a loaded pistol, and it seems from the evidence of a number of witnesses that deceased was perceptibly intoxicated and some of them stated that either his wife or one of her sisters insisted that he give up his cartridges; that he stated he would if appellant would also give up his and thereupon both gave their cartridges to one of the Mullins girls, who later turned them over to deceased's wife. On reaching the church it was learned that the services were over and some of the crowd at the invitation of Etta King and deceased's wife started to the home of Sherman King to have dinner. The crowd seems to have broken up into smaller groups and appellant testified when he learned his sisters had gone to the home of King, he followed and a little later Arnold King came in. He stated that at some time during the morning Arnold King took his pistol out of his pocket and took the cartridges out of it and kept them. About the time appellant arrived at Sherman King's, the family and some of the visitors were seated at the dinner table and others were about the house. According to his evidence, he was not expecting to eat dinner, but went to the kitchen for the purpose of getting a drink. Arnold King went to his wife, who was seated at the table, and asked her to give him his cartridges which she refused to do, but appellant came up and asked her to give up the cartridges so he could get the ones belonging to him. She gave the cartridges to Arnold King who in turn gave appellant his. Appellant started toward the front of the house and, after reaching another room or the porch, placed the cartridges in

his pistol. Up to this point there is no very great or material conflict in evidence, but from there on there is a sharp divergence of evidence, one family against the other. Arnold King called to his brother Sherman and was talking to him at or near the door of the kitchen. He said to him in effect that since he had married he did not care for anything or anybody. Sherman King testified that about this time appellant stepped to the door, drew his pistol and began firing at Arnold King, firing four or five shots, one or two of the shots being fired after deceased had fallen to the floor. He testified that Arnold King never drew or attempted to draw his pistol during the encounter and made no demonstration whatever toward appellant. He was fully corroborated by his daughter.

According to the evidence of appellant and his witnesses, including some of his sisters, when he stepped to the kitchen door the second time deceased said he was going to kill him, drew his pistol, and began firing at him, and that he then drew his pistol and returned the fire. There was also evidence that during the morning deceased had made the statement that he was going to kill somebody before night and that Frank Mullins was a coward. There is no evidence that there had ever been any trouble between deceased and his wife or between him and Frank Mullins, but evidently there must have been some feeling not disclosed by the evidence. A number of witnesses testified to the good reputation of appellant for peace, quietude, and good citizenship, and the evidence of some indicated that the reputation of deceased in that particular was not so good. When asked why he was carrying a pistol on the day of the homicide, appellant replied in substance that it was to protect his body, and when asked why he wanted his cartridges returned at the home of Sherman King, he said in effect that his pistol was no good without ammunition. Sherman King testified that when he first spoke to his brother, who was prostrated on the floor and asked him if he was dead, the latter replied that he had been killed. He was removed to the hospital and on the way told J. K. Taulbee that he was killed and reiterated this statement to the witness Taulbee after he reached the hospital and both Taulbee and Sherman King testified that he never held out or seemed to entertain any hope of recovery. Taulbee testified that after making this statement that he was killed he fur-

ther stated in effect that he did not know why appellant shot him; that they had had no trouble and he did not know he was mad at him. He further stated that he heard deceased make a statement to Gobel Allen, who reduced it to writing, in which he stated that he had a pistol in a holster but did not attempt to draw it and did not have any cartridges in it. Sherman King testified there was a bullet hole in the holster he took off his brother and that there was a scar on the pistol corresponding with the hole in the holster. He further testified that there were no bullet holes in the house in the direction that it is claimed deceased was shooting or back of where appellant was standing, but he did find bullet holes in the walls and floor from the other direction.

From the foregoing recital of the substance of the evidence, it is at once apparent that the first ground urged for reversal cannot be sustained. There is a sharp conflict in evidence and appellant's plea of self-defense is supported by the greater number of witnesses, but, on the other hand, there is ample evidence supporting the theory of the commonwealth on which to base a verdict of guilty.

It is peculiarly within the province of a jury to determine the weight to be given the evidence as well as the credibility of the witnesses testifying and this court is not authorized to invade that province. It has been consistently held that this court will not disturb the verdict of a jury on facts unless it is flagrantly against the evidence. Saylor v. Commonwealth, 235 Ky. 78, 29 S. W. (2d) 629; Jennings v. Commonwealth, 235 Ky. 391. 31 S. W. (2d) 622; Bourne v. Commonwealth, 234 Ky. 842, 29 S. W. (2d) 561. And a verdict may not be held flagrantly against the evidence merely because a greater number of witnesses testified for one side than for the other, since a jury may believe and accept the evidence of a single witness against that of a number. Bailey v. Commonwealth, 236 Ky. 126, 32 S. W. (2d) 725; Davis v. Commonwealth, 217 Ky. 801, 290 S. W. 702; Martin v. Commonwealth, 197 Ky. 425, 245 S. W. 895.

The only evidence called in question as incompetent is that relating to the statements made by deceased after he had indicated that his wounds were mortal and the only error urged in this particular is that the statement was reduced to writing and that the writing was

670

the best evidence and the court erred in admitting parol evidence of such statement in the absence of a showing that the writing had been lost or destroyed or could not be produced for some good reason, and Saylor v. Commonwealth, 97 Ky. 184, 30 S. W. 390, 17 Ky. Law Rep. 100; Hines v. Commonwealth, 90 Ky. 64, 13 S. W. 445, 11 Ky. Law Rep. 865, Wharton Criminal Law, sec. 679 and Russell on Crime, page 762, are cited as bearing out that contention. In the Saylor Case it was held in effect that where a dying declaration is reduced to writing and signed by deceased, parol evidence of its contents is inadmissible in the absence of proof of the loss of the writing, and the other authorities cited indicate the same rule where the writing is signed or both signed and sworn to by the deceased. But here no objection was interposed by counsel for appellant until they asked the witnesses if the statement made by deceased was reduced to writing and he replied in effect that Mr. Allen took the statement; but it was not shown that deceased signed the statement. It is therefore manifest that the authorities cited have no application.

Finding no error prejudicial to appellant's substantial rights, the judgment is affirmed.